UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No. 2:11-cv-01454-MMD-GWF |
| Plaintiffs, | ORDER |
| v. | (Defendants' Motion to Dismiss Relator's Complaint – dkt. no. 18) |
| APS HEALTHCARE, INC., et al., | |
| Defendants. | |

**I.   SUMMARY**

Before the Court is Defendants' Motion to Dismiss Relator's Complaint. (Dkt. no. 18.) For the reasons stated below, the Motion is granted in part and denied in part.

**II.   BACKGROUND**

On April 8, 2008, APS Healthcare, Inc. ("APS") contracted with the State of Nevada Department of Health and Human Services ("NDHHS"), Division of Health Care Financing and Policy ("DHCFP" or "Medicaid"), to provide certain care management and care coordination services to a specific population of Nevada Medicaid beneficiaries. The program aimed to improve the overall health status of aged, blind, and disabled ("ABD") recipients within the Medicaid Fee-for-Service system. The program was known as the Care Management, Care Coordination, and Behavioral Health Provider Recruitment Program (the "Program"), and was designed to decrease Medicaid's costs associated with treating severely or chronically ill patients by utilizing preventative care to reduce emergency room visits and inpatient hospitalizations.

Plaintiff Relator Cheryle Kerr ("Relator") is a former APS employee. She was formerly employed as a Client Services Coordinator II in APS' Las Vegas, Nevada office. She held the position from September 2, 2008, through December 28, 2009, when she resigned. Relator alleges that APS engaged in Medicaid fraud. Relator asserts that APS violated federal and state False Claims Act ("FCA") by failing to carry out certain purported requirements under contract and billing DHCFP as if APS had fulfilled such contractual obligations. For example, Relator alleges that APS enrolled patients in the Program without their consent and billed Medicaid for these patients' participation in the program, despite the fact that APS did not actually provide services under the Program. She further alleges that APS enrolled and billed Medicaid for "ghost patients" – that is, even when APS employees were unable to obtain a patient's consent to participate in the Program, APS employees were instructed to enter a notation into the computer system that the contact had been "successful," and that the patient had been enrolled "for mailings only." Relator also contends that APS unilaterally disbanded the field-based model of healthcare provision required in its contract with the government.

Relator alleges that APS concealed its contractual breaches by (1) fabricating electronic and paper records and making false statements to Nevada Medicaid officials, and (2) pressuring Relator to lie to a Nevada Medicaid official reviewing APS' field-based model.

Relator filed this action under seal pursuant to the federal FCA, 31 U.S.C. § 3729, *et seq.*, and the Nevada FCA, NRS § 354.040, *et seq.*, on September 9, 2011. (Dkt. no. 1.) The United States and the State of Nevada declined to intervene. (Dkt. no. 9.) The Court ordered the Complaint unsealed on May 17, 2012.

### III.   SUBMITTING FALSE CLAIMS

#### A.   Legal Standard

On a 12(b)(6) motion, the court must determine "whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 (9th Cir. 2011)

(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). "The heightened pleading standard of Rule 9(b) governs FCA claims." *Cafasso*, 637 F.3d at 1054 (citing *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001)). "Rule 9(b) [of the Federal Rules of Civil Procedure] provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Id.* (citing Fed. R. Civ. P. 9(b)). "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Id.* (citing *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

Further, "claims of fraud or mistake — including FCA claims — must, in addition to pleading with particularity, also plead plausible allegations [in accordance with *Iqbal*, 556 U.S. at 678-79]." *Cafasso*, 637 F.3d at 1055. "That is, the pleading must state 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged]." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (brackets in *Cafasso*)).

**B.     Analysis**

"The FCA was enacted during the Civil War with the purpose of forefending widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." *Ebeid*, 616 F.3d at 995 (citing *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265-66 (9th Cir. 1996)). "To encourage insiders to disclose fraud and thereby bolster enforcement, the FCA contains a *qui tam* provision that permits private persons (known as 'relators') to bring civil actions on behalf of the United States and claim a portion of any award." *Ebeid*, 616 F.3d at 995 (citing 31 U.S.C. § 3730(b), (d) (2008) and *Anton*, 91 F.3d at 1266 n.7).

The FCA "attaches liability, not to underlying fraudulent activity, but to the claim for payment." *Anton*, 91 F.3d at 1266 (citation and quotation marks omitted). "What constitutes the FCA offense is the knowing presentation of a claim that is either fraudulent or simply false." *Id.*

"The archetypal *qui tam* FCA action is filed by an insider at a private company who discovers his employer has overcharged under a government contract." *Anton*, 91 F.3d at 1266 (citing *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953 (9th Cir. 1995). "However, FCA actions have also been sustained under theories of supplying substandard products or services (*see, e.g., United States v. Aerodex*, 469 F.2d 1003 (5th Cir. 1972)); false negotiation, including bid rigging and defective pricing (*see, e.g., United States v. Ehrlich*, 643 F.2d 634 (9th Cir. [1981]). . . ; and false certification (*see, e.g., United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977))." *Anton*, 91 F.3d at 1266.

### 1. Presenting False Claims–31 U.S.C. § 3729(a)(1) and NRS § 357.040(1)(a)[1]

Section 3729(a)(1) prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to an officer or employee of the United States. A relator may establish falsity under a theory of factual falsity or legal falsity. Only factual falsity is at issue here. (*See* dkt. no. 28 at 13, n.2.) "In a run-of-the-mill 'factually false' case, proving falsehood is relatively straightforward: [a] relator must generally show that the government payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (internal quotation marks and citation omitted).

#### a. False Statements

Defendants argue that the Complaint does not allege the *sine qua non* of a FCA claim – that APS' billing statements to Medicaid contained false information. The Court agrees with Defendants regarding some of Relator's allegations, but determines that other allegations do in fact claim that APS submitted false claims to the government. Therefore, Relator's 31 U.S.C. § 3729(a)(1) and NRS § 357.040(1)(a) claims survive

---

[1]The parties agree that the Nevada FCA is virtually identical to the federal FCA, and analyze the statutes jointly in their pleadings. The Court does the same.

Defendants' Motion, but these claims may only proceed on the theories articulated herein.

Several of Relator's allegations do not relate to false invoices. These allegations are either wholly unrelated to false claims submitted by APS to Medicaid, or involve an alleged breach of APS' contractual obligations with DHCFP rather than APS submitting false claims to the agency. *Cf. Cafasso*, 637 F.3d at 1057 ("breach of contract claims are not the same as fraudulent conduct claims . . . unsavory conduct is not, without more, actionable under the FCA."). These allegations are as follows:

- APS contracted to receive compensation for its mailing and referral services based upon the number of contacts made, up to a monthly limit of $50,179.67. (Dkt. no. 2 at ¶ 8.) However, APS provided inadequate disease management and care coordination services to certain persons legitimately enrolled in the Program by only contacting clients by phone once a month, regardless of the patients' need. This resulted in incomplete or non-existent patient assessments (dkt. no. 2 at ¶ 27);

- APS failed to obtain verbal consent for certain patients enrolled in its field-based program, thus enrolling them against their will (*id.* at ¶ 13);

- Medicaid patients were not enrolled on-site and were not assisted with discharge planning as contractually required, but instead were automatically enrolled without their consent. APS achieved this enrollment from lists of inpatients which APS employees obtained from the Las Vegas hospitals they serviced (*id.* at ¶ 21);

- Relator witnessed instances of incomplete patient assessments resulting in inadequate care plans (*id.* at ¶ 28);

- APS was understaffed, which resulted in many cases sitting dormant for months and patients not receiving services (*id.* at ¶ 29);

- In order to manage APS' case backlog, APS management un-enrolled patients from disease management and care coordination services by altering patients' levels of acuity and decreasing their level of service to receive mailings only. This allegedly resulted in hundreds of severely ill patients receiving no or inadequate services (*id.* at ¶ 30);

- Patients received out-of-date or inadequate telephone referral information on the emergency contact line and other inadequate information regarding their healthcare needs from APS (*id.* at ¶ 32-36).

These allegations all fail to allege the submission of false invoices. They generally fall into one of two camps: (1) allegations concerning sub-par medical services; and (2) allegations that APS did not abide by its contractual obligations. The first set of

allegations – contained in paragraphs 13 and 32-36 – cannot state a viable FCA claim. Relator cannot proceed on her 31 U.S.C. § 3729(a)(1) or NRS § 357.040(1)(a) claims based on these allegations. The second set of allegations also do not serve as a basis for Relator's federal or state FCA causes of action as currently pled. These allegations demonstrate that APS did not fulfill its contractual obligations, but do not plead a nexus between this failure and the submission of false claims. (*See* dkt. no. 2 at ¶¶ 21, 27-29, 30).

However, several of Relator's allegations do relate to potentially false claims submitted by APS to Medicaid:

- Relator was asked to reassign case loads of departing APS employees. Some of these cases had allegedly been inactive for months but Medicaid was billed as if services were provided (*id.* at ¶ 31);

- Many patients enrolled in the Program between July 2009 and December 2009 were never provided with any services, but APS continued to bill Medicaid for months as if services had been provided to these patients on a monthly basis (*id.* at ¶¶ 13-15, 21-22).[2]

- Between at least September 2008 and fall 2009, APS had a policy of billing Medicaid for "ghost patients." Patients for whom APS representatives could not contact were nonetheless entered into the Care Connection computer program as successfully contacted, and that these patients were enrolled in the Program "for mailings only." APS billed Medicaid for these patients as if they had actually consented and been enrolled in the Program (*id.* at ¶¶ 23-25).

These allegations support the *sine qua non* of an FCA claim–that APS submitted false claims to Medicaid by billing Medicaid for services not provided.

**b.    Rule 9(b)**

Although several of Relator's allegations satisfactorily allege submission of a false claim, *see supra*, Defendants assert that Relator has not pled these claims with the particularity required by Fed. R. Civ. P. 9(b). Defendants argue that Relator fails to

---

[2]The allegations in paragraphs 3-15 and 21-22, when read together, support the contention in the last bullet-point. Read individually, not all of these paragraphs make an assertion regarding submission of billing statements. But taken together, they explain how APS billed DHCFP for services not provided.

6

present the "who, what, when, where, and how" to adequately place APS on notice of the specific fraudulent conduct for which they must defend. To this end, Defendants assert that Relator fails to identify with particularity a single, specific instance of a "service" that was billed to DHCFP which was not legally reimbursable.

Defendants concede that the Ninth Circuit does not require a relator to identify every specific false claim on a motion to dismiss. (Dkt. no. 29 at 7.) In fact, a relator is "not required to plead representative examples of false claims submitted to the Government to support every allegation, but he must plead with sufficient particularity to lead to a strong inference that false claims were actually submitted." *U.S. ex rel. Frazier v. IASIS Healthcare Corp.*, 812 F. Supp. 2d 1008, 1012 (D. Ariz. 2011). However, a relator must provide "reliable indicia" that could "lead to a strong inference that the claims were actually submitted." *Id.*

The allegations regarding the "ghost patients" are sufficiently particularized to survive Defendants' Motion to Dismiss. Relator pleads the timeframe in which such enrollment occurred (September 2008 through fall 2009), names the APS supervisor involved in instructing APS employees on such registration (supervisor Brooke Greenlee, dkt. no. 2 at ¶ 24), and describes how the false claims were entered into the Care Connection computer program. *Accord ex rel. McCarthy*, 140 F. Supp. 2d at 1068. Defendants are incorrect that the Complaint lacks particularized facts concerning whether the billing statements contained false statements. Rather, the allegations regarding ghost patients specifically allege that APS billed Medicaid for telephone services provided to patients who never in fact received such services. This is a false claim. Moreover, although Relator does not describe *how* APS billed Medicaid for these ghost patients, she does allege that the practice violated APS' contract with NDHHS, that APS discontinued the practice, and that APS was on an "action plan" with Medicaid because of such registrations. This constitutes "reliable indicia" that the false claims were submitted. *See ex rel. Frazier*, 812 F. Supp. 2d at 1012.

///

Likewise, the allegations in paragraphs 13-15 and 21-22 (taken together, *see supra* note 2) regarding APS' submission of claims for services not rendered survive Defendants' Motion. Relator provides the approximate time frame that the false statements were submitted. She also describes the database in which the false statements were stored – in the Care Connection computer program (dkt. no. 2 at ¶ 22). Relator provides sufficient detail about what was contained in the false statements. That is, APS made it seem as if patients were enrolled in the on-site programs and had consented to being enrolled in the Program. But in reality, many of these patients were not provided with any services. APS billed Medicaid for months as if services had been provided to these patients. Relator also names Ms. Greenlee as the supervisor who instructed her to enroll patients once enrolled in the on-site Program into the telephone Program. (*Id.* at ¶ 15.) These allegations provide particularized facts sufficient to place Defendants on notice of Relator's allegation that between July and December 2009, APS fraudulently billed Medicaid for patients whom did not receive any services.

The allegations in paragraph 31 also support Relator's FCA claims. The allegations point to an incident in which Relator was asked to reassign the caseload of a departed colleague, Ms. Gulseth. Relator alleges that she was instructed to discontinue follow-up activity with Ms. Gulseth's clients, and to enroll these clients in the monthly mailing program. Relator also alleges that Ms. Greenlee instructed her to enter activity into the case logs of Ms. Gulseth's clients for the month of December to show that APS had in fact interacted with a patient, and would bill Medicaid as if it had such an interaction, even though no December interaction had occurred. These allegations demonstrate the "who, what, and when" necessary to put Defendants on notice regarding the specifics of their allegedly fraudulent conduct.

### c. Materiality

Finally, Defendants argue that Relator fails to plead the element of materiality by failing to allege that DHCFP would not have paid APS had it known about any of the alleged contractual violations.

"The accepted definition of materiality for civil FCA claims, as for other federal statutes, equates materiality with 'ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 679 (5th Cir. 2003) (*en banc*) (citing *Kungys v. United States*, 485 U.S. 759, 770 (1988)) (brackets in *Southland*).

Regarding the "ghost patient" allegations, Defendants point to the fact that DHCFP placed APS on an "action plan" as evidence that the agency knew about APS' false claims but continued to compensate APS. They argue that Relator fails to allege that APS was not entitled to continue submitting invoices while negotiating with DHCFP regarding performance issues. Defendants are correct that Relator has not *proven* materiality, but she has certainly pled facts sufficient to demonstrate materiality. The evidence of the "action plan" infers that DHCFP understood that APS was submitting at least some false claims. But it is unclear from the Complaint whether or not DHCFP continued to compensate APS for the "ghost patients" once it realized false claims were submitted.[3] Therefore, it is plausible that the submission of claims for non-existent patients did affect the DHCFP's decision to compensate APS.

The allegations in paragraphs 13-15 and 21-22, concerning APS' fraudulent billing for patients not receiving services, also satisfy the materiality requirement. It is plausible that the government would not have compensated APS for Program services not provided had DHCFP known that APS was not in fact providing services. The allegations in paragraph 31 are material for this reason as well.

For the reasons stated above, Defendants' Motion to Dismiss Relator's 31 U.S.C. § 3729(a)(1) and NRS § 357.040(1)(a) claims is denied. These claims may proceed on

---

[3]The case cited by Defendants, *Southland Mgmt.*, 326 F.3d at 679, is inapposite as that case involved the appellate court affirming a motion for summary judgment, and based much of its materiality discussion on evidence in the *Southland* record. Comparable evidence in this case is simply not available to the Court at the motion to dismiss stage.

Plaintiff's allegations that APS fraudulently (1) billed Medicaid for patients not signed up for the Program (*see* dkt. no. 2 at ¶¶ 23-25) and (2) billed Medicaid for services not provided (*see id.* at ¶¶ 13-15, 21-22, 31). The claims may not proceed on a theory that APS provided poor services to its patients. Nor may the claims proceed on a theory that APS merely failed to meet its contractual obligations.

### 2. Knowingly Presenting a False or Fraudulent Record–31 U.S.C. § 3729(a)(2) NRS § 357.040(1)(b)

Subsection (a)(2) "imposes liability on any person who 'knowingly makes, uses, or causes to be made or used, a sales record or statement to get a false or fraudulent claim paid or approved by the Government." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009). A plaintiff must show that "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statement caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Id.* "The primary distinction between a claim under section 2 and a claim under section 1 is that section 2 requires an affirmative false statement. To provide any distinct meaning to section 1 it is clear that no such express false statement is required." *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 627 (W.D. Wis. 1995).

Relator alleges that her supervisor asked her to misinform Mr. Whaley, a representative of the state Medicaid program, about the functioning of field-based enrollment programs in designated hospitals. The Court agrees with Defendants that the Complaint fails to connect the allegedly false statements made to Mr. Whaley to any submission of false claims. Relator has not alleged the existence of a false statement or record distinct from an underlying false claim made for the purpose of getting a false claim paid. The allegations concerning Mr. Whaley demonstrate that APS may have failed to comply with its contractual obligations, and attempted to misinform Mr. Whaley that it was in fact complying with its obligations. But, nowhere does the Complaint allege that these misrepresentations were made in order to get a false claim paid or approved

by the government. The Complaint must make such an allegation to satisfy the requirements of 31 U.S.C. § 3729(a)(2). This claim is therefore dismissed without prejudice.[4]

## IV. RETALIATION–31 U.S.C. § 3730(H) AND NRS § 357.240(2)[5]

### A. Legal Standard

The heightened pleading standard articulated in Fed. R. Civ. P. 9(b) is not applicable to Relator's retaliation claims. Rather, the notice pleading requirements of Fed. R. Civ. P. 8(a) apply to these claims. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1102 (9th Cir. 2008).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

When determining the sufficiency of a claim, "[w]e accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party[; however, this tenet does not apply to] . . . legal conclusions . . . cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citation and internal quotation marks omitted). "Therefore, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Id.* (citation and internal quotation marks omitted); *see also Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'").

---

[4]The only allegations appearing to give rise to a potential § 3729(a)(2) claim are those concerning APS' interaction with Mr. Whaley. Save this allegation, Relator fails to allege the existence of specific false records or statements made for the purpose of influencing the government's decision to pay a false claim. *See Hopper*, 588 F.3d at 1327.

[5]The Nevada FCA retaliation statute is substantially similar to the federal statute, and the Court accordingly analyzes Relator's claims under the two statutes jointly for the purposes of this Motion.

### B.  Analysis

"Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." *Anton*, 91 F.3d at 1269. The statute contains three elements: "1) the employee must have been engaging in conduct protected under the Act; 2) the employer must have known that the employee was engaging in such conduct; and 3) the employer must have discriminated against the employee because of her protected conduct." *Id.*

Regarding element 1, "the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Anton*, 91 F.3d at 1269. Defendants argue that Relator merely took efforts to cause APS to comply with her understanding of APS' Medicaid contract (dkt. no. 18 at 24), and that the Complaint fails to adequately plead a nexus between Relator's investigation and an FCA violation. The Court disagrees. Though Relator has not proven that her investigation was directly related to potential fraud, the allegations taken together allege that Relator investigated matters which she reasonably believed could amount to a false claim or which could reasonably lead to a viable FCA action. *Accord LeVine v. Weis*, 90 Cal. App. 4th 201, 209-10 (2001) (under the retaliation provision of the False Claims Act, "[p]laintiff . . . need only show that he had reasonably based suspicions of a false claim"). For example, she inquired about the legality of the "ghost patient" program, and raised concerns about the program to her supervisors. (Dkt. no. 2 at ¶ 24.) And while "[i]nvestigation into an employer's noncompliance with state or federal regulations is insufficient to state a claim for retaliation under the FCA[,]" *Brazill v. California Northstate Coll. of Pharm., LLC*, No. 2:12-1218, 2012 WL 3204241, at *5 (E.D. Cal. Aug. 2, 2012), the Complaint taken as a whole adequately alleges that Relator's inquiries about the legality of the program were related to matters that could reasonably lead to a viable FCA action. She inquired about APS' policy of billing non-existent "ghost patients," (dkt. no. 2 at ¶ 24), and about its policy of not providing services to hundreds of patients (*id.* at

¶ 31). (*See also id.* at ¶ 37: Relator spoke with her supervisors about APS' "referral practices.") She also alleges that she entered data into the Care Connection program about these services not rendered, and the Complaint when read as a whole makes it clear that this documentation may have formed the basis for APS' fraudulent billing of DHCFP. (*See* dkt. no. 2 at ¶ 22.)

Element 2 is also satisfied for the purposes of this Motion because Relator pleads that she spoke directly to APS employees and supervisors about her concerns regarding the Program. (*See, e.g.,* dkt. no. 2 at ¶ 24.)

Defendants argue that Relator has failed to plead facts sufficient to satisfy element 3 – that APS discriminated against Relator because she engaged in protected conduct. "[A]n action may be cognizable as discrimination under the False Claims Act . . . if it is reasonably likely to deter employees from engaging in activity protected under either of these statutes." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 848 (9th Cir. 2002). The Complaint details how Relator experienced workplace taunts and was assigned retaliatory tasks after she raised concerns regarding APS' failure to provide services to patients signed up for the Program (among other concerns). (Dkt. no. 2 at ¶ 37-39.) These allegations describe behavior on APS' part which is reasonably likely to deter employees from raising concerns about a potential FCA violation. *See Moore*, 275 F.3d at 848.

For these reasons, Defendants' Motion to Dismiss Relator's retaliation causes of action fails.

**V.     CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss (dkt. no. 18) is GRANTED IN PART and DENIED IN PART as follows:

- Defendants' Motion is DENIED as it relates to Relator's 31 U.S.C. § 3729(a)(1) and NRS § 357.040(1)(a) causes of action. Relator may proceed on these causes of action only under the theories described *supra*;

- Defendants' Motion is GRANTED as it relates to Relator's 31 U.S.C. § 3729(a)(2) NRS § 357.040(1)(b) claims.  Those claims are DISMISSED WITHOUT PREJUDICE;
- Defendants' Motion is DENIED in all other respects.

DATED THIS 30th day of January, 2013.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE